UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TRACEY T. TURNER, a minor by and through his
parents and next friends, TRACY R. TURNER and
TRACY TURNER, and TRACY R. TURNER,
individually, and TRACY TURNER, individually,

    Plaintiffs,

vs.                                                     CASE NO. 3:03-cv-709-J-25TEM

UNITED STATES OF AMERICA,

    Defendant.
_____/

## ORDER

**THIS CAUSE** was tried before this Court on Counts I, II and III of the Amended Complaint. Based upon the testimony and evidence received at trial, and the applicable legal standards, this Court makes the following findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, Tracey T. Turner ("Tracey) and his parents Tracey ("Father") and Tracy R. ("Mother") Turner brought this medical malpractice action against the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 2679, *et. seq.* This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b) and the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80. Plaintiffs have satisfied all conditions precedent to the bringing of this action, including the requirements set forth in 28 U.S.C. § 2675(a). In the sections below, and after a recitation of facts, this Court addresses the issues of liability, causation and damages.

On August 21, 2003, Plaintiffs instituted the instant Federal Tort Claims Act (FTCA) medical malpractice action against the Defendant based on medical treatment of the minor Plaintiff Tracey at the Jacksonville Naval Air Station Hospital ("Jax NAS") on August 27, 2001. (Dkt. 1). The amended complaint (Dkt. 4) sets forth three counts: Count I is a negligence claim on behalf of Tracey; Count II is a loss of consortium claim by Tracy R. Turner, as Mother and Legal Guardian of the minor Plaintiff; and Count III is a loss of consortium claim by Tracey Turner, as Father and Legal Guardian of the minor Plaintiff.

## I. BACKGROUND FACTS AND SUMMARY OF CONCLUSIONS

On August 27, 2001, in Jacksonville, Florida, Tracey was presented to the emergency department of Jax NAS at 8:20 p.m. Tracey, then aged 9, was suffering a severe asthma attack (status asthmaticus), manifesting symptoms of sweating, wheezing, and shortness of breath. Upon arrival at the emergency room, Tracey could see. He walked up to the triage nurse, put his hands on the nurse's knees, and looked into his face. Within 1 to 3 minutes his mental status ("mentation") changed and he became combative as a result of oxygen deprivation.

Tracey, thereupon, came under the care of Lieutenant Commander Shane Cline, M.D. Dr. Cline determined that Tracey was "in extremis" but was appropriately triaged as an "urgent case." At approximately 8:25 p.m., Dr. Cline ordered that Tracey receive: an Albuterol/Atrovent Nebulizer treatment; Solumedrol; and Magnesium Sulfate. Those medicines were expected by Dr. Cline to be administered within 10 minutes. However, the Magnesium Sulfate was never given, the Solumedrol was not given until 9:03 p.m., and it is unclear whether the Atrovent was ever given. The failure to administer these medicines as ordered by the physician was a violation of the standard of care. In any event, the "Nebulizer" treatment was

not effective and all parties agree that Tracey then needed to be intubated using Rapid Sequence Intubation ("RSI").[1]

Once the decision is made to intubate, the RSI should be completed as soon as possible, but should take no more than five minutes. According to the Plaintiffs' expert, Dr. James Ungar, the Defendant should have begun RSI at 8:40 p.m. when it was apparent that the nebulizer treatment was not working. Even the Defendant's emergency care expert, Dr. James Hillman, admitted that the need for RSI was apparent between 8:37 p.m. and 8:42 p.m.

Lastly, Dr. Cline, Tracey's principal treating physician, admitted that RSI was indicated at 8:45 p.m. Dr. Cline further admitted that change in an asthma patient's "mental status" is a sign of respiratory deterioration and that such a mental status change occurred in Tracey at 8:45 p.m. The nurse's notes state indicate that at 8:45 p.m Tracey became violent, grabbed his mother by her hair and pulled out his IV.

Despite Dr. Cline's belated recognition of the need for RSI at 8:45 p.m., and the fact that RSI should be accomplished within five minutes of need, Tracey was not intubated for another 32 minutes, at 9:17 p.m.[2] The delay in intubation caused Tracey to incur respiratory arrest which in turn caused cardiac arrest and brain damage. The evidence of what occurred between 8:45 p.m., when Dr. Cline knew Tracey needed to be intubated, and 9:17 p.m., when the Defendant finally completed the intubation, establishes that Defendant was careless.

RSI requires the orderly and prompt administration of medicines followed by insertion of

---

[1] Rapid Sequence Intubation is a method of placing a breathing tube down the patient's trachea to provide air to the lungs.

[2] Of that 32 minutes, only one minute was required for Nurse Wagoner's successful intubation at 9:17 p.m.

3

a breathing tube through the throat of the patient into the trachea. The usual medicines to be administered in rapid sequence are: Lidocaine (to numb the throat), Ketamine (an anesthetic sedative to relax the patient); and Succinylcholine (a paralytic neuro muscular blockage agent) to paralyze the patient. In RSI these are to be given one after another. It is imperative that intubation be completed promptly after the paralytic agent is administered because when the lungs become paralyzed, the patient is completely dependent on his medical providers and the breathing tube for oxygen to his lungs, heart and brain.

The Jax NAS records show that Tracey was suffering from an acute asthmatic attack ("status asthmaticus") upon his arrival at 8:20 p.m. As such, he was a candidate for RSI if his nebulizer treatment were to prove ineffective. When the nebulizer treatment did prove to be ineffective (between 8:37 and 8:42 p.m. according to Defendant's expert, Dr. Hillman) and, at the latest, when Tracey underwent a change in mental status at 8:45 p.m., the RSI should have begun immediately and been completed in 5 minutes--by 8:50 p.m., at the latest.

This is not what transpired. The Defendant's personnel did not administer the first medication of the RSI, Lidocaine, until 8:57 p.m., a full twelve minutes after Dr. Cline identified Tracey as being hypoxic and in need of RSI. The Ketamine was administered one minute later at 8:58 p.m., and the Succinylcholine at 8:59 p.m. Succinylcholine takes effect 30 to 60 seconds after administration, and since Tracy's lungs would then be paralyzed, it was imperative that he be intubated immediately. If for some reason a patient is not intubated immediately, he receives no air at all unless oxygen is pressed into his lungs by means of a bag mask. However, the records show that the bag masking of Tracey did not start until 9:03 p.m., four minutes after the

administration of the Succinylcholine. By paralyzing the child's lungs and waiting four minutes to start bag masking him, the Defendant failed to properly care for Tracey.

This Court finds that the protocol of Jax NAS is that only medical doctors, not nurses, administer Succinylcholine.[3] Despite that protocol, Nurse Charles White testified that he administered the Succinylcholine. Nevertheless, Dr. Cline was aware that the Succinylcholine had been administered.

The Jax NAS records show that bag masking did not start, and intubation was not even attempted, until four minutes after the paralytic agent (Succinylcholine) was administered. Dr. Cline contends that when he did undertake intubation, the Succinylcholine had not taken effect and he ordered another dose.

Subsequent to the administration of Succinylcholine, Jax NAS physicians tried and failed six times to put the breathing tube down Tracey's trachea. The Defendant's explanation for these failures is that emesis prevented the doctors from viewing Tracey's airway and that Tracey was "combative" and difficult to hold down. This Court finds neither excuse valid. The medical record does not mention emesis until after Dr. Cline's first two attempts at intubation. The brain damage was sustained between 9:08 and 9:10 p.m., Dr. Cline's second intubation attempt was at 9:06 p.m., and emesis did not begin until 9:07 p.m. Moreover, emesis should not prevent intubation. "Blind intubations" can be performed. This Court, therefore, does not accept emesis as a complication that prevented Dr. Cline from viewing the trachea nor one that prevented the next four attempted intubations. Nor does this Court accept that Tracey's combativeness, due to

---

[3] Presumably, that protocol is to ensure that no paralysis of the lungs is induced until the physician is standing by, ready to intubate. Otherwise, the patient's lungs could be paralyzed by the nurse causing absolute oxygen deprivation, while the doctor is not ready to proceed.

a lack of oxygen, seriously delayed the intubation.

Protocols were introduced to show what size laryngoscope would be appropriate for a 9-year-old boy but that a 9-year-old falls into the "gray area" of those charts. Therefore, this Court does not conclude that this was a factor in the inability to intubate Tracy.

## II.   STANDARD OF CARE

The Florida law of medical negligence is succinctly summarized by standard jury instruction approved by the Florida Supreme Court.

**Fla. Stan. Jury Instr. 4.2a—Medical Negligence**

> Negligence is the failure to use reasonable care. Reasonable care on the part of a [physician][hospital][health care provider] is that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by similar and reasonably careful [physicians][hospitals][health care providers].

"Reasonable care" is specifically defined by the medical malpractice statute and is identical to that as defined in the jury instruction. 766.102(1) Fla. Stat.

The Defendant contends that simple negligence is not the appropriate standard in the instant matter because the Florida Good Samaritan Act ("GSA" or "Act") applies which requires proof of "recklessness." 768.13, Fla. Stat. The GSA states that certain healthcare providers cannot be liable for civil damages incurred from the rendering of emergency medical treatment unless this is proof of reckless disregard by the health care provider. 768.13(2)(b)1, Fla. Stat. (2001). The Defendant contends that its actions, even if negligent, did not meet the statutory definition of reckless. Plaintiffs, on the other hand, maintain the version of the Act in effect at the time of Tracey's entrance into the NAS Jax emergency department specifically stated that only hospitals licensed under Chapter 395 by the State of Florida were subject to the reckless

disregard standard.

It is, therefore, critical for this Court to review the two versions of the Act and determine which applies in this matter. In 2001, the GSA provided:

> Any hospital licensed under chapter 395 . . ., and any person licensed to practice medicine who in good faith renders medical care or treatment necessitated by a sudden, unexpected situation or occurrence resulting in a serious medical condition demanding immediate medical attention, for which the patient enters the hospital through its emergency room or trauma center . . . shall not be held liable for any civil damages as a result of such medical care or treatment unless such damages result from providing, or failure to provide, medical care or treatment under circumstances demonstrating a reckless disregard for the consequences so as to affect the life or health of another.

§ 768.13(2)(b)1, Fla. Stat. (2001). Furthermore, under the 2001 version of the Act reckless disregard was defined as:

> such conduct that a health care provider knew or should have known...would be likely to result in injury so as to affect the life or health of another, taking into account the following...:
>
> a. The extent or serious nature of the circumstances prevailing.
> b. The lack of time or ability to obtain appropriate consultation.
> c. The lack of a prior patient-physician relationship.
> d. The inability to obtain an appropriate medical history of the patient.
> e. The time constraints imposed by coexisting emergencies."

§768.13(2)(b)3., Fla. Stat. (2001). Under the 2001 version of the Act, it would appear that Jax NAS could not be sheltered under the coverage of the Act as the hospital was not licensed under

Chapter 395.[4]

> The current version of the GSA provides:
>
> > Any health care provider, including a hospital licensed under chapter 395, providing emergency services ... shall not be held liable for any civil damages as a result of such medical care or treatment unless such damages result from providing, or failing to provide, medical care or treatment under circumstances demonstrating a reckless disregard for the consequences so as to affect the life or health of another.

§ 768.13(2)(b)1, Fla. Stat. The definition of reckless disregard has also been altered and is currently defined as:

> such conduct that a health care provider knew or should have known, at the time such services were rendered, created an unreasonable risk of injury so as to affect the life or health of another, and such risk was substantially greater than that which is necessary to make the conduct negligent.

§ 768.13(2)(b)3, Fla. Stat. The new version of the Act would seem to cover Jax NAS. Therefore, it is critical for this Court to determine which version of the Act applies here.

This Court notes that the 2003 amendment to the Good Samaritan Act included other changes to Florida law with respect to actions for medical malpractice. In enacting these changes, the Legislature expressed its intent: "...to apply the provisions of this act to prior medical incidents, to the extent such application is not prohibited by the State Constitution or Federal Constitution...." Ch. 2003- 416, §86, Laws of Fla.

Florida law provides that retroactive application of a statute is possible depending on the

---

[4] There was no testimony in this matter that showed that Jax NAS was licensed under Chapter 395 by the State of Florida. Moreover, the Defendant's family practice residing director, Dr. Jeffrey Quinlan, testified on cross-examination that Jax NAS is not licensed by the State. Therefore, it appears that the Good Samaritan Act should be inapplicable in this matter and that the standard should be reasonable care as defined by § 766.102(1) Florida Statutes.

outcome of two inquiries. *Romine v. Fla. Birth Related Neurological Injury Comp. Ass'n*, 842 So.2d 148, 153 (Fla. 5th DCA 2003). First, is there clear legislative intent for the statute to apply retroactively? If not then that ends the inquiry and the statute will only apply prospectively. *Romine*, 842 So.2d at 153. Second, would the retroactive application of the statute be constitutional? In other words, "[c]ourts will not permit the retroactive application of a statute if the statute impairs vested rights, creates new obligations, or imposes new penalties. . ." *Romine*, 842 So.2d at 153.

As discussed above, the legislature has expressly provided for the retroactive application of the changes to the Good Samaritan Act. Therefore, the sole question before this Court is whether or not the changes to the Act would impair a vested right. A vested right has been defined as:

> an immediate, fixed right of present or future enjoyment and also as an immediate right of present enjoyment, or a present, fixed right of future enjoyment. To be vested, a right must be more than a mere expectation based on an anticipation of the continuance of an existing law; it must have become a title, legal or equitable, to the present or future enforcement of a demand. Vested rights are distinguished not only from expectant rights but also from contingent rights. Rights are vested, in contradistinction to being expectant or contingent. They are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons, as a present interest. They are expectant when they depend upon the continued existence of the present condition of things until the happening of some future event. They are contingent when they are only to come into existence on an event or condition which may not happen or be performed until some other event may prevent their vesting.

*R.A.M of South Fla., Inc., v. WCI Communities, Inc.*, 869 So.2d 1210, 1218 (Fla. 2d DCA 2004)(internal citations and quotations omitted).

With such a definition in mind, this Court is faced with determining whether a vested right is altered by the new language of the Good Samaritan Act. Plaintiffs maintain that on the date of Tracey's injuries he had a substantive right to recover damages against Defendant and its agents for reckless disregard as that term was then defined in the Act. This Court agrees with Plaintiffs' assertions and concludes that the 2001 version of the GSA is the appropriate version to be applied to the facts of this case. *See Rupp v. Bryant*, 417 So.2d 658 (Fla. 1982); *Talmadge v. District School Board of Lake County*, 406 So.2d 1127 (Fla. 5th DCA 1981). Accordingly, since Jax NAS was not licenced under Chapter 395, the GSA would not provide any protection to Defendant. Hence, this Court's determination of negligence is governed by a simple reasonableness determination. With the appropriate standard in mind, this Court concludes that Defendant, in fact, breached the reasonable standard of care in the treatment of Tracey.

### III. CAUSATION

This Court finds that due to the delay in starting the RSI after Dr. Cline became aware of its necessity at 8:45 p.m., as well as the failure to bag mask or intubate Tracey immediately after administration of Succinylcholine at 8:59 p.m., Tracey suffered respiratory arrest which lead to cardiac arrest at 9:07 p.m. and Asystole (absence of heart contractions) at 9:09 p.m.

### IV. COMPARATIVE NEGLIGENCE

The Defendant's contention that the minor Plaintiff's parents were comparatively negligent in this case for failure to bring Tracey to a hospital sooner lacks both factual and legal bases. This Court hereby finds by a preponderance of the evidence that the parents acted reasonably in their care of Tracey in this matter. One of the Defendant's physicians admitted that Tracey's severe asthma could have started at "any time prior to arrival." Moreover, when Tracey

arrived at JAX NAS as 8:20 p.m., there remained more than enough time to provide appropriate medical treatment and avoid any permanent injury. Even if the parents had unreasonably cared for Tracey prior to his arrival at the hospital, other causes of a patient's condition is generally not a legal defense to a claim for subsequent medical malpractice under Florida law. *Stuart v. Hertz Corp.*, 351 So. 2d 703 (Fla. 1977).

## V.     **INJURIES**

As a result of the Defendant's care of Tracey, he suffered respiratory arrest leading to cardiac arrest and brain damage. As a result of this brain damage, Tracey has incurred cortical blindness which has permanently reduced his vision to 20-400 in each eye. The Defendant's neurological expert, Dr. James Nealis, testified that Tracey's permanent disability is 49% of the body as a whole. As a result of that blindness, Tracey had to withdraw from regular public school and enroll in the Florida School for the Deaf and Blind. Despite being described as a great kid, Tracey faces enormous hurdles in life due to his injuries and disabilities incurred in this incident.

Prior to the events at Jax NAS, Tracey was an above-average student. He was conscientious and loved to read. He had many friends and enjoyed many outdoor activities and sports, such as basketball and football. He had particularly enjoyed that, shortly before this incident, he had "defeated" his father (an ex-college basketball player) in a backyard game.

Now, following his cortical blindness, Tracey can no longer compete in these sports. He has to spend most of his time inside of his home where he knows where everything is. Because his blindness is caused by brain damage rather than an injury to the eyes themselves, his vision

can never be corrected nor improved. For the remainder of his life Tracey will only see the world as a distant blur.

Cortical blindness is not Tracey's only disability from this event. He also has diminution of sensory function in his hands, more to the right hand than the left. Since he is naturally right handed, he has had to try to train the left hand to do more tasks than is natural. An example of his difficulty is that he is encountering significant hurdles in learning to read by Braille at the Florida School for the Deaf and Blind. He starts significantly behind most of his classmates because most have learned Braille from the start of their education while Tracey has only started in mid-childhood. He is also limited by his loss of sensory perception in his hands, which makes it inordinately difficult to feel the raised Braille dots that are the basis of the Braille system. Although this 13 year old is in the 7th grade, he is currently reading Braille on the Kindergarten level.

In addition to the above, this Court finds that Tracey's brain damage has caused a reduction in academic performance from above average to below. Moreover, his injury has affected what the treating neuro-psychologist, Dr. Russell Addeo, calls his "executive decision making" function, which is a limitation of Tracey's ability to plan and problem solve.

## VI. ECONOMIC DAMAGES

The evidence as to economic damages was not refuted. The Plaintiffs' called as damage witnesses Dr. Michael Shahnasarian, a rehabilitation expert, and Dr. Joseph Perry, an economist. Dr. Shahnasarian testified as to Tracey's medical and related needs resulting from his injury and determined the present costs of those needs. Dr. Perry then took Dr. Shahnasarian's numbers and reduced them to present day value and, based upon reasonable and commonly accepted economic

principals, found that those needs had a present day value of $783,598. Of that amount, $118,118 will be incurred between the date of trial and Tracey's 18th birthday (damages awardable to his parents) and $665,480 will be incurred after his 18th birthday (damages awardable to Tracey himself).

This Court here notes that the Defendant introduced testimony from Defendant's risk manager, W. Robert Meyer, that Tricare had paid all of Tracey's medical bills to date and would continue paying them as long as Tracey's father remained on active duty in the Navy. If Tricare coverage does terminate, Tracey can apply to the Secretary of the Navy for an extension of coverage. Any such extension would be at the discretion of the government. On cross-examination Mr. Meyer admitted that any actual payments of medical expenses beyond the date of Meyer's own testimony at trial would be "speculative." Tracey's father could be killed or die suddenly, or otherwise cease active duty in the Navy. Consequently, this Court will not ascribe any credit to the government for such hoped-for but non-vested future medical payments.

Dr. Shahnasarian also evaluated Tracey's potential for gainful employment to determine his lost ability to earn income. Dr. Shahnasarian testified that he can reasonably estimate a child's educational outcome and earnings based upon his pre-injury functioning and the education and achievement level of his parents. Dr. Shahnasarian and Dr. Perry testified that prior to his injury, Tracey would probably have obtained a bachelor's degree and earned income between the ages of 22 and 67. Based on Dr. Shahnasarian's testimony, the Court finds that Tracey would probably have obtained a bachelor's degree had he not been injured, and earned the average lifetime income of those with that educational attainment. Due to Tracey's post-incident disabilities, Tracey will probably never be competitive in the job market and will be substantially

unemployed for life. Dr. Perry used Dr. Shahnasarian's numbers and testified that, given Tracey's probable unemployability, the present value of his loss of ability to earn income is $1,198,847.

This Court finds that Dr. Shahnasarian's testimony regarding Tracey's life care plan is persuasive. Therefore, the Court hereby finds that the Plaintiffs have suffered economic damages in the following amounts:

    a)    Tracey T. Turner, a minor, in the amount of $1,864,327.

    b)    Tracy R. Turner and Tracey Turner, parents, jointly, in the amount of $118,118.

## VII. MINOR PLAINTIFF'S NON-ECONOMIC DAMAGES

The Florida law regarding non-economic damages for a plaintiff is succinctly summarized by the following Florida Standard Jury Instruction:

> Any bodily injury sustained by [Tracey] and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconvenience or loss of capacity for the enjoyment of life experienced in the past, or to be experienced in the future. There is no exact standard for measuring such damage. The amount should be fair and just, in the light of the evidence.

Florida Standard Jury Instruction 6.2a.

Tracey's injury was caused by the carelessness of the Defendant almost four years ago. During those four years, Tracey has suffered. He went into a coma on the night of the injury. He awoke into a world where he was blind and had to relearn how to do the most elementary daily activities. There are an almost infinite number of ways that Tracey's condition has and will affect and limit him for the remaining 57 years of his life expectancy. The loss is tragic and catastrophic and when coupled with his economic damages, the non-economic damages easily should be

2,500,000. This decision is consistent with reported jury verdicts: *Grasso v. Wasserman*, JVR No. 194735, 1997 WL 151149 (Fla. Cir. Ct.); *Jones v. West Volusia Authority*, 94 FJVR 10-99, 1994 WL 866001 (Fla. Cir. Ct.).

## VIII. THE PARENTS' NON-ECONOMIC DAMAGES

In addition to their economic damages described above, Tracey's parents have incurred loss of filial consortium. That loss is defined as: "Any loss by the parents, by reason of that injury, of the child's companionship, society, love, affection, and solace in the past and in the future until the child reaches the age of 18." *Florida Standard Jury Instruction 6.2e*.

These losses are recoverable because the greater weight of the evidence shows that Tracey "sustained a significant injury resulting in permanent total disability." *Id.*

In *United States v. Dempsey*, 635 So. 2d 961 (Fla. 1994), the Florida Supreme Court confirmed that under Florida law a parent can recover for loss of consortium based on a child's injury when the injury does not result in the child's death. The court, however, limited such recovery "in the same manner in which recovery for the loss of parental consortium has been limited by the legislature. Section 768.0415 limits a child's recovery for [loss of parent's consortium]...to those losses caused by a significant injury 'resulting in a permanent total disability.'" *Dempsey*, 635 So. 2d at 965.

Thus, the *Dempsey* court expressly relied on §768.0415, Florida Statutes, in requiring that the child suffer a "permanent total disability" as a condition to a parent's recovery for loss of filial consortium. *Id.*

The Florida Legislature has not defined "permanent total disability" as that phrase is used in §768.0415. In addition, it appears that no Florida appellate court has construed "permanent total

15

disability" as it applies to either a child's loss of parental consortium under §768.0415 or a parent's loss of filial consortium pursuant to *Dempsey*. *See* Richard C. Alvarez, *Have You Checked the Children's Claims*, 74 Fla. Bar J. 72, Oct. 2000. It is anticipated that when Florida appellate courts address the issue, they will define "permanent total disability" as the phrase already defined by the Florida workers' compensation law and the Social Security Act. *Id.* Under Florida workers' compensation law, permanent total disability is presumed where the employee has suffered, among other things, industrial blindness. §440.15(1)(b)5, Fla. Stat. Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical...impairment which can be expected...to last for a continuous period of not less than 12 months." 42 U.S.C. §§416(i), 423(d)(1), 1382c(a). Under either definition, Tracey T. Turner's blindness qualifies as a "permanent total disability." Based on all of the above, this Court hereby finds that the parents are entitled to damages for loss of filial consortium.

Total non-economic damage for the Plaintiffs are as follows:

c) *Tracey T. Turner, a minor,* in the amount of $2,500,000.

d) *Tracy R. Turner, mother, individually,* in the amount of $750,000.

e) *Tracey Turner, father, individually,* in the amount of $750,000.

## IX. GUARDIANSHIP

Pursuant to Subsection 744.387(3)(b), Florida Statutes, it is hereby ordered that a guardian for the minor Plaintiffs' property shall be appointed within 60 days from the date of this Final Judgment. Said guardian shall be authorized to accept the net amount of the minor's judgment and execute a satisfaction for same.

Accordingly, it is **ORDERED**:

The Clerk is **DIRECTED** to enter a judgment in favor of the minor plaintiff, Tracey T. Turner, in the amount of $4,364,327, in favor of the co-plaintiff, Tracy R. Turner, in the amount of $809,059, and in favor of the co-plaintiff, Tracey Turner, in the amount of $809,059. Thereafter, the Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in Jacksonville, Florida, this 26 day of August, 2005.

HENRY LEE ADAMS, JR.
UNITED STATES DISTRICT JUDGE

Copies to:
Counsel of Record